UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| TIMOTHY DUNN, | |
| Plaintiff, | No. 20 C 04329 |
| v. | Judge Thomas M. Durkin |
| HAMRA ENTERPRISES and HAMRA MANAGEMENT COMPANY, LLC, | |
| Defendants. | |

**MEMORANDUM OPINION AND ORDER**

Timothy Dunn sued Hamra Enterprises and Hamra Management Company, LLC (collectively, "Hamra"), alleging retaliation in violation of the Fair Labor Standards Act ("FLSA") and retaliatory discharge under Illinois law. Hamra has moved for summary judgment on all claims. For the reasons set forth below, Hamra's motion is denied.

**Background**

The following facts are undisputed except where otherwise indicated. Hamra is a franchisee of various restaurants and hotels, including Wendy's, Panera Bread, Noodles & Company, and Holiday Inn Express & Suites. R. 62 ¶ 2. Dunn was originally hired by Hamra in the position of facilities manager in July 2001. R 62 ¶ 6. In 2013, he was promoted to Director of Maintenance. *Id.* In 2016, he assumed the position of Regional Director of Facilities ("RDF") for the Chicago area. *Id.* At the time Dunn assumed the Chicago RDF role, Hamra also employed RDFs in its two other markets: New England and Missouri. R. 62 ¶ 7. Dunn held the RDF position until his

1

employment with Hamra was terminated on May 14, 2020. R. 62 ¶ 1. Dunn's direct supervisor at the time of his termination was Ben Kaplan. R. 62 ¶ 15.

Dunn's position as RDF entailed supervising several technicians who reported to him, managing the facilities in his region, managing budgets, and providing oversight on capital projects. R 62 ¶ 8. His duties also included vendor relations, site inspections, and ensuring regulatory compliance. *Id*.

At the time of his termination, Dunn supervised four field technicians in the Chicagoland area. R 62 ¶ 14. Dunn was typically responsible for tracking, collecting, and submitting hours worked by the field technicians and other employees that reported to him. R 62 ¶ 10. His team would record their hours on timesheets, which were then entered electronically and sent to Hamra's payroll department by Dunn. R. 62 ¶ 11.

In early February of 2020, Kaplan exchanged emails with Hamra management regarding the "Reorganization of Development / Construction Leadership." R. 62 ¶ 17. Kaplan's email proposed that he "oversee all development which includes construction" and that "facilities leadership remains the same." R. 56-2. It also made other proposals concerning a "facilities / construction point person" in each market. *Id*. At some point in February 2020, Kaplan was asked to take over facilities leadership for Hamra. R. 62 ¶ 15.

The start of the COVID-19 pandemic brought with it a host of rapid changes. Beginning March 16, 2020, Kaplan directed the facilities department to stop all non-essential work due to COVID. R. 62 ¶ 18. Kaplan told the department that Hamra

would authorize work necessary to keep its restaurants open. *Id.* Kaplan also told Dunn to have his team prepare the Panera Bread restaurants for outdoor dining and to install signs and banners. R. 62 ¶ 36. Kaplan was aware that this task might require Dunn's team to work overtime. R. 62 ¶ 37. However, according to Dunn, Kaplan instructed him not to record any of the team's overtime hours on their timecards for submission. R. 72 ¶ 6. Kaplan denies ever telling Dunn to omit overtime hours. *Id.* At least some of Hamra's restaurants saw a decline in sales in the early weeks of the pandemic. R. 62 ¶ 19.

On March 22, 2020, Kaplan emailed Hamra management to discuss the immediate reduction of facilities team hours to 20 per week. R. 62 ¶ 20. Two days later, Kaplan submitted a proposal for reduced hours and restructuring on the facilities team to Hamra management. R. 62 ¶ 21. The proposal included laying off the administrative assistant and warehouse repair technician on Dunn's team, but kept Dunn in place as the Chicago RDF. *Id.*; R. 56-5.

According to Dunn, he first raised the issue of nonpayment of overtime around this time. Dunn allegedly asked Kaplan if he could add unpaid overtime hours to a laid-off employee's final timecard so it would be included in his final pay, and that Kaplan said no. R. 72 ¶ 7. Dunn objected and said the employee was owed the money, having put in the overtime hours. *Id.* Kaplan denies telling Dunn this overtime could not be paid. *Id.*

Additional developments soon followed. Hamra's RDF for the New England market retired on March 27, 2020 and his position was not filled. R. 62 ¶¶ 22, 30.

3

Kaplan sent an email to Hamra management on April 1, 2020, indicating that none of the facilities technicians in Chicago were HVAC certified, requiring Hamra to bring in outside vendors for maintenance work. R. 62 ¶ 23; R. 56-7. Dunn testified at his deposition that he was HVAC certified, and that one of his technicians had received HVAC certification while employed by Hamra. R. 52, at 50:20-51:4. Two days later, Kaplan emailed Hamra management and several other employees, including Dunn, to say that Chad Halley would be taking over as RDF for Southern Bread (a collection of restaurant locations in Mississippi, Tennessee, and Arkansas), removing this from Dunn's area of responsibility. R. 62 ¶ 24. The email thanked Dunn for his "awesome continued leadership." R. 56-8.

Dunn alleges that he raised the unpaid overtime issue again after certain employees' pay was reduced in early April. R. 72 ¶ 8. He claims to have asked Kaplan how the pay reduction would affect the overtime that was still owed, and that Kaplan told him Hamra was not going to pay that overtime. *Id*. Kaplan denies saying this. *Id*. Dunn allegedly raised the issue a third time later in April, after Hamra received a Paycheck Protection Program loan from the government. R. 72 ¶ 9. Dunn asked Kaplan whether the receipt of the loan meant that Hamra was going to pay Dunn's team for their overtime, and Kaplan said no. R. 72 ¶ 9. Kaplan likewise denies this. *Id*.

On April 27, 2020, Kaplan sent an email to Hamra management informing them of imminent plans to move the Chicagoland facility warehouse to a new location in Carpentersville that was closer to the restaurants it serviced. R. 56-9. In the email,

4

Kaplan said, "At one point I was thinking that [Dunn] might quit over this change." *Id.* Kaplan also suggested that at least some of the Chicago area technicians spent multiple hours per day driving to and from work and said he would "deal with this once we come out of this crisis." *Id.*

By May of 2020, Kaplan had decided that Hamra's facilities infrastructure needed to be restructured to improve cost-effectiveness. R. 62 ¶ 26. In a May 2 email, Kaplan proposed promoting Halley (then the RDF for Missouri and Southern Bread) to Senior Director of Facilities, a newly created position. R. 62 ¶ 27. Under the proposal, the RDFs for each market, including Dunn, would report to Halley. *Id.* At the time, Kaplan was also in the process of reviewing the qualifications of all Hamra's technicians, with the stated goal of each having experience in some or all of several relevant facilities disciplines, apparently in order to cut down on the expense of hiring outside vendors. R. 62 ¶ 28. A member of Hamra's management asked whether a director was needed in each market given that Halley would be overseeing the entire department under Kaplan's proposal. R. 62 ¶ 29. Kaplan said yes and that it would be "good to have someone in each market as a leader." R. 56-11.

On May 7, Dunn sent an email to Kaplan expressing several concerns. First, he said his team was unhappy with recent scheduling changes. R. 72 ¶ 11. Next, he said that members of his team were concerned about the lack of hygiene facilities (restrooms and sinks) at the new maintenance facility in Carpentersville. *Id.* According to Dunn, this absence meant technicians needed to use the restrooms at the Panera Bread next to the Carpentersville facility, which was apparently not being

5

deep-cleaned and had a confirmed COVID diagnosis among its staff. *Id.* Finally, the May 7 email asked about the status of the additional hours worked by technicians in mid to late March that were still unpaid. R. 72 ¶ 10. Dunn said his technicians were aware that their co-worker who had been terminated had not been paid for his overtime at the time of his termination, and that the "events and circumstances are weighing heavily." R. 72 ¶ 10.

Kaplan forwarded Dunn's email to Hamra management with additional comments. R. 72 ¶ 12. Kaplan said that since telling Dunn about the maintenance facility relocation, Dunn had been "very challenging to work with" and had "a very negative attitude with a bunch of our operators in Chicago and including with me." *Id.* Kaplan further wrote, "I know this should not be personal but I have to say that where I believe this is going is not a good outcome for him." *Id.* Kaplan also forwarded Dunn's email to Sonja Breuer, Hamra's director of Human Resources, writing, "Also this email from Tim is not good. I have been struggling with his negative attitude since we shut down his warehouse a week ago." R. 72 ¶ 15. Breuer responded, "Wow, read Tim's response. Sounds like it was a bitch session. Do we owe them the hours worked?" *Id.*

The morning of May 8, 2020, Kaplan sent another email to Hamra management regarding Dunn's email, writing, "I believe we might need to take immediate action with Tim and probably another two of his team. It's taken me a bit of time but right now with Tim and his teams [sic] behavior, we would be better off with no one in facilities in Chicago." R. 72 ¶ 17. Kaplan then sent a revised

6

restructuring plan for the facilities department to Hamra management. R. 62 ¶ 31. The proposal included laying off two field technicians in the Chicago market and one field technician in the New England market. *Id*. The May 8 proposal did not include any changes to Dunn's position, though it identified him as a "high risk of departure." R. 62 ¶ 31; R. 56-13; R. 72 ¶ 14. However, Kaplan also referenced Dunn's May 7 email and said he wanted to "discuss what all of this means … in regard to [Dunn] and his leadership in the market." R. 56-13. Simeon Shelton, a member of Hamra's management team, responded, "I think we need to eliminate [Dunn]'s position, I don't believe we need him if Chad can oversee the entire department. I also don't see his email as being supportive of anything we are trying to do, but I would simply eliminate his position because its [sic] not needed anymore." R. 56-13. Shelton referred to Dunn's complaint about the Carpentersville situation as a "veiled threat" and told Kaplan to forward the email to Breuer if he had not already done so. *Id*.

Kaplan submitted a third proposal on May 9. R. 62 ¶ 33. This proposal eliminated the RDF positions in all markets. *Id*.

Breuer called Dunn on May 8 (the day after his email to Kaplan) regarding the unpaid overtime issue. R. 72 ¶ 30. The two also discussed the team's concerns over the lack of hygiene fixtures at the new maintenance facility. R. 72 ¶ 32. Breuer asked Dunn to send her an email containing all overtime hours his team had worked, which he provided on May 11, 2020. R. 72 ¶ 30. Hamra sent each of the technicians a letter and a check for their unpaid overtime wages on May 12. R. 62 ¶ 47.

7

On May 14, 2020, Hamra terminated four employees: Dunn, two field technicians from Chicago (including Dunn's son), and one field technician from New England. R. 62 ¶ 34. The two other Chicago field technicians remained employed. R. 62 ¶ 35. Separately, and before Dunn was terminated, Breuer told another member of Hamra's management that Dunn could be a "total ass" sometimes and called him "litigious." R. 72 ¶¶ 35-36. Hamra disputes that Breuer had any involvement in the decision to terminate Dunn, saying that her role was purely administrative as Hamra's head of HR. Hamra did not approach Dunn about accepting a position as a technician, even with lower pay, instead of termination. R. 72 ¶ 28.

## Legal Standard

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). To defeat summary judgment, a nonmovant must produce more than a "mere scintilla of evidence" and come forward with "specific facts showing that there is a genuine issue for trial." *Johnson v. Advocate Health and Hosps. Corp.*, 892 F.3d 887, 894, 896 (7th Cir. 2018). The Court considers the entire evidentiary record and must view all of the evidence and draw all reasonable inferences from that evidence in the light most favorable to the nonmovant. *Horton v. Pobjecky*, 883 F.3d 941, 948 (7th Cir. 2018). The Court does not "weigh conflicting evidence, resolve swearing contests, determine credibility, or ponder which party's version of the facts is most likely to be true." *Stewart v. Wexford Health Sources, Inc.*, 2021 WL 4486445, at *1 (7th Cir. Oct. 1, 2021). Ultimately, summary judgment is warranted only if a

reasonable jury could not return a verdict for the nonmovant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

## Analysis

I.   Retaliatory Discharge under Fair Labor Standards Act

To establish a prima facie case of unlawful retaliation in employment under the FLSA, Dunn must show: (1) that he engaged in protected expression or activity; (2) that he suffered an adverse employment action; and (3) a causal link between the protected conduct and the adverse action. *See Kasten v. Saint-Gobain Performance Plastics Corp.*, 703 F.3d 966, 972 (7th Cir. 2012). That Dunn suffered an "adverse employment action" is undisputed. Therefore, the Court must determine whether the evidence in the record, taken in the light most favorable to Dunn, would permit a reasonable jury to conclude that Dunn engaged in some protected expression or activity and that Hamra terminated his employment because of that conduct.

At the outset, a note on how the Court's analysis should proceed. Courts previously discussed "direct" and "indirect" methods of proving retaliation claims, utilizing slightly different standards, frameworks, or tests for each. *See, e.g.*, *Schmidt v. Hands On CDL Driving Sch., Inc.*, 2022 WL 656170, at *3 (W.D. Wis. Mar. 4, 2022) (discussing past practice). However, the Seventh Circuit has repudiated these distinctions, holding that the "legal standard … is simply whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the discharge or other adverse employment action." *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 765 (7th Cir. 2016). In assessing

9

this question, "all evidence belongs in a single pile and must be evaluated as a whole." *Id.* at 766.

    a. <u>Protected Expression or Activity</u>

As to the first disputed element, "[a]n employee engages in a protected activity by either: (1) filing a charge, testifying, assisting or participating in any manner in an investigation, proceeding or hearing under Title VII or other employment statutes; or (2) opposing an unlawful employment practice." *Northington v. H & M Int'l*, 712 F.3d 1062, 1065 (7th Cir. 2013). While an employee can "file" a charge via an oral or written complaint to his or her employer, the complaint "must be sufficiently clear and detailed for a reasonable employer to understand it, in light of both content and context, as an assertion of rights protected by the statute and a call for their protection." *Kasten v. Saint-Gobain Performance Plastics Corp.*, 563 U.S. 1, 14 (2011); *see also Northington*, 712 F.3d at 1065 ("Vague and obscure 'complaints' do not constitute protected activity."). The key is whether the complaints objectively provide "fair notice" to the employer of the statutory right asserted. *See Kasten*, 563 U.S. at 14. "The number and nature of prior discussion between the employer and employee, the employee's assertion that the employer was breaking the law, and the employer's reaction to the complaint are relevant in determining whether the complaint is protected." *Garcia v. Draw Enters. III, LLC*, 2018 WL 6045206, at *8 (N.D. Ill. Nov. 19, 2018). This issue presents "a matter of factual analysis" that ordinarily must be resolved on a case-by-case basis. *See Valerio v. Putnam Assocs. Inc.*, 173 F.3d 35, 45 (1st Cir. 1999).

The Court finds that a reasonable jury could conclude that Dunn engaged in protected expression, because his complaints concerned Hamra's alleged knowing and willful (if temporary) refusal to pay its employees for overtime hours they worked. Dunn testified that he complained to his supervisor, Kaplan, who was in direct contact with Hamra's management executives throughout the relevant period, about his team's unpaid overtime three times, and that each time he was told the overtime would not be paid. This repetition supports Dunn's position. *See Kasten*, 703 F.3d at 976 (noting that employee's repeated verbal complaints supported finding that employer had fair notice of plaintiff's assertion of rights). Furthermore, the complaints concerned specific employees who had apparently not been paid for a specific period of time. They are thus distinguishable from the sort of "abstract grumblings" that courts have held insufficient to support a retaliation claim under the FLSA. *Compare Starnes v. Wallace*, 849 F.3d 627, 632 (5th Cir. 2017) (finding complaints that company was "violating the law" by not paying an employee for travel and overtime were sufficiently detailed), *with Sloan v. Am. Brain Tumor Ass'n*, 901 F.3d 891, 894-95 (7th Cir. 2018) (noting that while employee's failure to mention the FLSA in her complaints was "not necessarily fatal," the complaints were insufficient because they merely alleged the employer was violating the law without offering any specificity as to how).

Likewise, a jury could view Dunn's subsequent written complaint and Hamra's response as evidence that Hamra understood (or should have understood) Dunn's complaints as an assertion of protected rights. The written complaint reiterates the

11

unpaid overtime issue, even noting that a terminated employee had not yet been paid for time owed. A member of Hamra's management, on being apprised of this email, said that it "reads like a veiled threat" and told Kaplan to forward it to the HR director. *Cf. Garcia*, 2018 WL 6045206, at *8 (citing evidence that employee's supervisor quickly raised the employee's complaint with in-house counsel and HR supervisor as indicative of employer's understanding). Shortly thereafter, Hamra (through Breuer) requested information about the unpaid time and sent its employees their overdue wages.

To be sure, Dunn's complaints were not so explicit as to make this an easy case. But even if Dunn failed to use magic words like "illegal" or cite particular statutory provisions in his complaints, an employer should not need an employee to remind it of its legal obligation to pay non-exempt employees for their overtime work under the FLSA. Other decisions suggest that complaints of obviously unlawful payment practices can form the basis of a retaliatory discharge claim even in generalized form. *See, e.g.*, *EEOC v. White & Son Enters.*, 881 F.2d 1006, 1011 (11th Cir. 1989) (finding women who complained about unequal pay relative to male employees had sufficiently asserted their rights under the FLSA to state a retaliatory discharge claim). And to the extent Hamra disputes that the oral conversations between Dunn and Kaplan took place (either at all or in the manner Dunn describes), this is simply a factual disagreement that cannot be resolved on summary judgment.[1]

---

[1] The Court declines to take up Dunn's undeveloped argument that Hamra's position on this fact issue is sanctionable under 28 U.S.C. § 1927.

The Court also disagrees with Hamra's contention that Dunn's complaints were merely part of his job (because part of his responsibilities was reporting his team's hours to payroll) and therefore outside the scope of the FLSA's anti-retaliation provision. *See Mousavi v. Parkside Obstetrics, Gynecology & Infertility, S.C.*, 2011 WL 3610080, at *4 (N.D. Ill. Aug. 16, 2011). This argument seems to draw primarily on caselaw outside the Seventh Circuit, and it is questionable whether it is consistent with *Ortiz* and later cases. In any event, a jury could reasonably conclude that Dunn stepped outside his ordinary job responsibilities when he lodged multiple complaints about Hamra's apparent overtime violations, including nonpayment to an employee who no longer worked for Hamra. This is especially true given Dunn's testimony that Kaplan told him not to record his team's overtime hours, in contravention of his ordinary practice.

    b. <u>Causal Relationship</u>

As to the second disputed element, a plaintiff claiming unlawful retaliation must show that his or her protected activity was a but-for cause of the adverse employment action—in other words, that Hamra would not have terminated Dunn had he not made his complaints. *See Lesiv v. Ill. Cent. R.R. Co.*, 39 F.4th 903, 915 (7th Cir. 2022). Causation may be inferred from circumstantial evidence, including "(1) suspicious timing, ambiguous statements or behaviors; (2) evidence that similarly situated employees were treated differently; or (3) a pretextual reason for adverse employment action." *Kasten*, 703 F.3d at 973. Hamra argues that Dunn's termination was merely a product of the ongoing facilities restructuring, and that his position was

eliminated alongside others due to redundancy and a lack of desired qualifications among his team.

A jury could no doubt find the timing of Dunn's termination indicative of retaliatory motive. Dunn had worked for Hamra for nearly 20 years, including 4 in his position as RDF for Chicago, yet the evidence permits a finding that Hamra made the decision to eliminate his position within days of receiving his written complaint, and he was in fact terminated soon thereafter. Whether the timing alone is sufficient to create an inference of causation is debatable. *Compare Moser v. Ind. Dep't of Corrs.*, 406 F.3d 895, 905 (7th Cir. 2005) ("[S]uspicious timing alone rarely is sufficient to create a triable issue."); *with Loudermilk v. Best Pallet Co.*, 636 F.3d 312, 315 (7th Cir. 2011) ("Occasionally, however, an adverse action comes so close on the heels of a protected act than an inference of causation is sensible."). Here, however, the added context around the decision to terminate Dunn's employment supports a reasonable inference of causation. *See Loudermilk*, 636 F.3d at 315 ("Deciding when the inference is appropriate cannot be resolved by a legal rule; the answer depends on context.").

First, although the elimination of Dunn's RDF position could be viewed as part of Hamra's ongoing restructuring process (which had begun several months earlier), just a few days before Dunn's May 7 email, Kaplan himself had advocated for keeping him in place, saying it would be helpful to have an established leader in the market. Other evidence similarly reflects that Hamra had a positive view of Dunn's contributions in his leadership role in the weeks before he was terminated. Second, Dunn has provided evidence to undercut the argument that his termination was

14

related to a lack of qualifications among his staff. He testified that he and at least one of his technicians were HVAC certified, so the idea that Hamra was incurring undue expense because it had to hire outside vendors could be seen as pretextual. Finally, evidence from around the time Dunn was terminated suggests others among Hamra's management responded negatively to his complaints, including labeling him as "litigious." Hamra disputes the relevance of some of this evidence, but extending all reasonable inferences in favor of Dunn, these factors bolster the suspicious timing enough to create a triable issue of fact.

A jury may ultimately believe Hamra's explanation that Dunn's termination was simply a by-product of the reorganization, meant to improve efficiency at a time when the restaurant industry was under significant stress. But "[t]he fact that the defendant may be able to produce evidence that the plaintiff was fired for a lawful reason just creates an issue of fact: what was the true cause of the discharge?" *Stone v. City of Indianapolis Pub. Utils. Div.*, 281 F.3d 640, 643 (7th Cir. 2002); *see also Schmidt*, 2022 WL 656170, at *5 (denying summary judgment despite defendant's explanation providing a "potential, even powerful, lawful reason" for plaintiff's termination). Here, the evidence is far from one-sided, and Hamra is not entitled to summary judgment. It will be up to a jury to decide which story holds water.

II. <u>Retaliatory Discharge under Illinois Law</u>

The tort of retaliatory discharge acts as a "limited and narrow" exception to the general rule that an at-will employee may be discharged at any time and for any reason. *Turner v. Mem'l Med. Ctr.*, 911 N.E.2d 369, 374 (Ill. 2009). To state a claim for retaliatory discharge under Illinois law, "an employee must allege that (1) the

employer discharged the employee, (2) in retaliation for the employee's activities, and (3) that the discharge violates a clear mandate of public policy." *Id.* "Illinois courts have held that the 'clear mandate of public policy' standard is met in the context of workers' compensation claims and whistleblowing." *Benders v. Bellows & Bellows*, 515 F.3d 757, 766 (7th Cir. 2008); *see also Reid v. Neighborhood Assistance Corp. of Am.*, 2013 WL 1087557, at *5 (N.D. Ill. Mar. 14, 2013) (explaining that the whistleblower theory typically involves an employee terminated for reporting unlawful or improper conduct ); *Michael v. Precision Alliance Group, LLC*, 952 N.E.2d 682, 687 (Ill. App. Ct. 2011). A retaliatory discharge claim can encompass "the reporting of the violation of regulations and statutes other than the Criminal Code." *Stebbings v. Univ. of Chi.*, 726 N.E.2d 1136, 1145 (Ill. App. Ct. 2000). The whistleblower theory likewise requires proof that the employee's discharge contravened a clearly mandated public policy. *Reid*, 2013 WL 1087557, at *5 (citing *Mackie v. Vaughan Chapter-Paralyzed Veterans of Am., Inc.*, 820 N.E.2d 1042, 1049 (Ill. App. Ct. 2004)). Dunn's termination is undisputed, and for the reasons explained above, a reasonable jury could conclude that it was in retaliation for Dunn's complaints. The remaining question is whether his termination violated Illinois public policy, which is a question of law for the Court to resolve. *Id.* at 374-75.

As Hamra points out, Illinois courts have at times been reluctant to extend the reach of retaliatory discharge. *See McGrath v. CCC Info. Servs., Inc.*, 731 N.E.2d 384, 389-90 (Ill. App. Ct. 2000) (collecting cases). To that end, the Illinois Supreme Court has held that "generalized" expressions of public policy will not suffice—the employee

16

must identify a "clear mandate of public policy" that is violated by the discharge. *See Turner*, 911 N.E.2d at 375-76. Dunn identifies two policies he says were violated: (1) the policy against firing employees for reporting violations of the Illinois Minimum Wage Law ("IMWL"), and (2) the policy of protecting employees who report occupational health hazards.

At least one court in this district has already found that termination for reporting an IMWL violation satisfies the public policy element of retaliatory discharge. *See Reid*, 2013 WL 1087557, at *6 (citing *Stebbings*, 726 N.E.2d at 1144). On this authority, the Court finds that Dunn's complaints about overtime pay satisfy the public policy element.

Furthermore, Dunn's complaint about potential health and safety hazards at the Carpentersville maintenance facility is sufficient as well. Illinois courts "are most likely to grant relief if the noncriminal regulations or statutes involved in retaliatory discharge suits involve health and safety." *Stebbings*, 726 N.E.2d at 1145; *see also Gomez v. The Finishing Co.*, 861 N.E.2d 189, 197 (Ill. App. Ct. 2006) ("Preventing the discharge of an employee who reports occupational health hazards furthers the public policy of protecting the lives and property of Illinois citizens."). Dunn's complaint regarding the Carpentersville facility concerned an apparent failure to provide basic hygiene accommodations and potential (or even likely) exposure to COVID-19. Accordingly, the Court finds that Dunn's alleged complaints and subsequent termination concerned important matters of public policy that will support a claim of retaliatory discharge. For this reason, and incorporating the discussion above

17

regarding protected activities and causation, Hamra has not shown that it is entitled to summary judgment on Dunn's common law retaliatory discharge claim.

## Conclusion

For the foregoing reasons, Hamra's motion for summary judgment (R. 55) is denied.

ENTERED:

_____

Honorable Thomas M. Durkin
United States District Judge

Dated: September 16, 2022